**No. 22-1186**

---

**IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

KRISTINA GARCIA,

*Plaintiff-Appellant*,

v.

BEAUMONT HEALTH ROYAL OAK HOSPITAL *et al.*

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Eastern District of Michigan, Southern Division
Honorable Linda V. Parker

---

# Brief for Defendant-Appellee Beaumont Health Royal Oak Hospital

Eric J. Pelton (P40635)
Thomas J. Davis (P78626)
KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.
280 N. Old Woodward Avenue
Suite 400
Birmingham, Michigan 48009
(248) 645-0000
epelton@khvpf.com
tdavis@khvpf.com

*Attorneys for Defendant-Appellee*
*Beaumont Health Royal Oak Hospital*

## Disclosure of Corporate Affiliations and Financial Interests

Under 6th Cir. R. 26.1, Beaumont Health Royal Oak Hospital makes these disclosures:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?

Answer: No.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

Answer: No.

*/s/Thomas J. Davis*
Eric J. Pelton (P40635)
Thomas J. Davis (P78626)
KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.
280 N. Old Woodward Avenue
Suite 400
Birmingham, Michigan 48009
(248) 645-0000
epelton@khvpf.com
tdavis@khvpf.com

*Attorneys for Defendant-Appellee*
*Beaumont Health Royal Oak Hospital*

Dated: July 1, 2022

## Table of Contents

Disclosure of Corporate Affiliations and Financial Interests .................. i

Table of Authorities ........................................................................ vi

Statement Regarding Oral Argument ................................................ xi

Statement of Jurisdiction ...................................................................... 1

Statement of Issues Presented ............................................................... 2

Introduction ........................................................................................... 4

Statement of the Case ............................................................................ 5

I. Factual Background. ........................................................................ 5

A. Garcia's work as a respiratory therapist. ...................... 5

B. Garcia has a long amicable relationship with fellow respiratory therapist Rachel Luca, a co-worker with no history of sexual harassment complaints. ...................................... 6

C. Three years into their friendship, Garcia accuses Luca of "sexual assault" a week after it allegedly happened. ........................................... 7

D. At Garcia's request, respiratory therapist supervisor Net Carroll is chosen to investigate the allegations. ........................................... 9

E. Carroll promptly investigates and learns that the only eyewitness to the alleged incident denied that Luca touched Garcia inappropriately. ........................................................ 10

F. Carroll counsels and warns Luca, and Garcia admits that this response was satisfactory and that no further sexual communications occurred. ........................................... 11

G. Garcia complains that Luca's denials of Garcia's self-publicized accusations is "retaliation." ........ 12

H. Beaumont investigates the "retaliation" claim and disciplines Luca for disregarding Carroll's instruction not to discuss confidential investigations. ........ 14

I. Garcia steps down as a Charge Therapist two months after Luca is terminated for failing to report to work. ........ 15

II. Relevant Procedural History ........ 16

Standard of Review ........ 17

Summary of Argument ........ 18

Argument ........ 22

I. Beaumont's investigation prevented sexual harassment by Luca, and that—not Garcia's newfound dissatisfaction with the investigation—is the dispositive issue for her claim. ........ 22

A. Garcia's claim that Beaumont is liable because it did not verify her allegations has no legal support. ........ 25

B. Garcia's argument that a jury should second-guess the investigation results contravenes well-established policy ........ 27

C. Garcia has waived her challenge to the Court's exclusion of her affidavit—but, in any event, the affidavit is inadmissible and irrelevant to the issue of Beaumont's notice. ........ 30

1. The district court properly disregarded the unsupported, speculative affidavit under Rule 56(c)(4) ........ 31

2. The affidavit, even if admissible, does not reflect that Beaumont had notice that Luca harassed *Garcia*. ........ 33

D. Garcia may not rely upon alleged "retaliation" to bolster her sexual-harassment claim. ........ 36

II. Garcia may not recast her "investigatory dissatisfaction" theory into a disparate-treatment framework, but her claim fails under that framework too ........ 38

A. Garcia cannot make out a prima facie case because her voluntary resignation was not an adverse job action. ........ 40

1. Garcia abandoned her challenge to the district court's reasoning that she did not show Beaumont made a deliberate attempt to make her resign. ........ 41

2. Garcia cannot show "objectively intolerable" conditions when she resigned two months after the alleged harasser had been terminated. ........ 43

3. It is not objectively reasonable to transfer to avoid working with a co-worker who was investigated and whose alleged harassment ended. ........ 45

B. Garcia has failed to show that a similarly situated man received more favorable treatment ........ 48

C. Garcia cannot show that Beaumont's legitimate business reason for its level of discipline to Luca is false and pretext for unlawful sex discrimination. ..... 50

III. The district court correctly granted summary judgment on the retaliatory harassment claims. ..... 51

A. Luca's defending herself against Garcia's accusations that Garcia herself spread to co-workers is not retaliation, let alone severe retaliation. ..... 53

B. For the same reasons, the district court correctly dismissed the individual claim against Luca for retaliation. ..... 56

C. Beaumont's investigation and discipline of Luca shows that it did not condone the alleged retaliation. ..... 58

IV. The district court did not abuse its discretion in affirming the taxation of costs against Garcia. ..... 61

Conclusion ..... 63

Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements ..... 64

Certificate of Service ..... 65

Designation of Relevant District Court Documents ..... 66

## Table of Authorities

### Cases

*Agnew v. BASF Corp.*,
286 F.3d 307 (6th Cir. 2002) .......... 43

*Akers v. Alvey*,
338 F.3d 491 (6th Cir. 2003) .......... 54

*Alexander v. Caresource*,
576 F.3d 551 (6th Cir. 2009) .......... 40, 48

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 18

*Andreoli v. Gates*,
482 F.3d 641 (3d Cir. 2007) .......... 24

*Baldwin v. Blue Cross/Blue Shield of Alabama*,
480 F.3d 1287 (11th Cir. 2007) .......... 28, 45

*Barnett v. Boeing Co.*,
306 F. App'x 875 (5th Cir. 2009) .......... 45

*Blankenship v. Parke Care Centers, Inc.*,
123 F.3d 868 (6th Cir. 1997) .......... 29

Bowling v. Pfizer, Inc.,
102 F.3d 777 (6th Cir. 1996) .......... 18

*Burlington Indus., Inc. v. Ellerth*,
524 U.S. 742 (1998) .......... 41

*Calderon v. Ford Motor Credit Co.*,
300 F. App'x 362 (6th Cir. 2008) .......... 35

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 18

*Chen v. Dow Chem. Co.*,
580 F.3d 394 (6th Cir. 2009) .......... 50

*Collette v. Stein-Mart, Inc.*,
126 F. App'x 678 (6th Cir. 2005) .......... 24

*Costantino v. TRW, Inc.*,
13 F.3d 969 (6th Cir. 1994) .......... 40

*Coulson v. The Goodyear Tire & Rubber Co.*,
31 F. App'x 851 (6th Cir. 2002) .......... 46

*Deleon v. Kalamazoo Cnty. Rd. Comm'n*,
739 F.3d 914 (6th Cir. 2014) .......... 43

*Dixon v. Int'l Bhd. of Police Officers*,
504 F.3d 73 (1st Cir. 2007) .......... 54

*Doe v. City of Detroit*,
3 F.4th 294 (6th Cir. 2021) .......... 22, 23, 24, 59

*E.E.O.C. v. Harbert-Yeargin, Inc.*,
266 F.3d 498 (6th Cir. 2001) .......... 34

*Ellington v. City of E. Cleveland*,
689 F.3d 549 (6th Cir. 2012) .......... 17

*Feminist Majority Found. v. Hurley*,
911 F.3d 674 (4th Cir. 2018) .......... 54

*Fleenor v. Hewitt Soap Co.*,
81 F.3d 48 (6th Cir. 1996) .......... 24

*Frow v. De La Vega*,
82 U.S. 552 (1872) .......... 57

*Garza v. Lansing Sch. Dist.*,
972 F.3d 853 (6th Cir. 2020) .......... 33

*Harris v. L & L Wings, Inc.*,
132 F.3d 978 (4th Cir. 1997) .......... 29

*Hawkins v. Anheuser–Busch, Inc.*,
517 F.3d 321 (6th Cir. 2008) .......... 26

*Henderson v. Walled Lake Consol. Sch.*,
469 F.3d 479 (6th Cir. 2006) ........ 34

*Hunt v. Monro Muffler Brake, Inc.*,
769 F. App'x 253 (6th Cir. 2019) ........ 28

*Kimberly v. Coastline Coal Corp.*,
857 F.2d 1474 (6th Cir. 1988) ........ 57

*Komis v. Sec'y of United States Dep't of Lab.*,
918 F.3d 289 (3d Cir. 2019) ........ 53

*Krafsur v. Davenport*,
736 F.3d 1032 (6th Cir. 2013) ........ 40

*Laster v. City of Kalamazoo*,
746 F.3d 714 (6th Cir. 2014) ........ 51, 52, 58

*Mast v. IMCO Recycling of Ohio, Inc.*,
58 F. App'x 116 (6th Cir. 2003) ........ 37

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ........ 18

*Morris v. Oldham Cnty. Fiscal Ct.*,
201 F.3d 784 (6th Cir. 2000) ........ 37, 38

*Mullins v. Goodyear Tire & Rubber Co.*,
291 F. App'x 744 (6th Cir. 2008) ........ 45

*N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n*,
900 F.2d 903 (6th Cir. 1990) ........ 40

*Noviello v. City of Boston*,
398 F.3d 76 (1st Cir. 2005) ........ 37, 54

*Ondo v. City of Cleveland*,
795 F.3d 597 (6th Cir. 2015) ........ 31, 32

*Pearce v. Chrysler Grp., L.L.C. Pension Plan*,
615 F. App'x 342 (6th Cir. 2015) ........ 62

*Radvansky v. City of Olmsted Falls*,
395 F.3d 291 (6th Cir. 2005) .......... 42

*Scarberry v. Exxonmobil Oil Corp.*,
328 F.3d 1255 (10th Cir. 2003) .......... 59

*Self-Ins. Inst. of Am., Inc. v. Snyder*,
827 F.3d 549 (6th Cir. 2016) .......... 42, 52

*Sheridan v. Forest Hills Pub. Sch.*,
247 Mich. App. 611 (2001) .......... 35

Singleton v. Smith,
241 F.3d 534 (6th Cir. 2001) .......... 18

*Smith v. Pallas*, No. 18-1933,
2019 WL 7946345 (6th Cir. Nov. 7, 2019) .......... 31, 42, 49

Smith v. Rock-Tenn Services, Inc.,
813 F.3d 298, 311-312 (6th Cir. 2016) .......... 27

*Swenson v. Potter*,
271 F.3d 1184 (9th Cir. 2001) .......... 29, 46, 59

*Tchankpa v. Ascena Retail Grp., Inc.*,
951 F.3d 805 (6th Cir. 2020) .......... 41, 42

*Terwilliger v. Greyhound Lines, Inc.*,
882 F.2d 1033 (6th Cir. 1989) .......... 40

*Von Gunten v. Maryland*,
243 F.3d 858 (4th Cir. 2001) .......... 55

*White v. Burlington N. & Santa Fe R. Co.*,
364 F.3d 789 (6th Cir. 2004) .......... 54

*Williams v. Gen. Motors Corp.*,
187 F.3d 553 (6th Cir. 1999) .......... 35

*Wyatt v. Nissan N. Am., Inc.*,
999 F.3d 400 (6th Cir. 2021) .......... 51, 52

**Statutes**

MCL 600.2543(1) .......... 62

**Other Authorities**

10A Wright, Miller, *et al.*, Federal Practice & Procedure § 2723 (4th ed.) .......... 44

EDMI Admin. Order 21-AO-034 .......... 62

Wright, Miller, *et al.*, *Federal Practice & Procedure* § 2688.1 (4th ed.) .......... 57

www.mied.uscourts.gov/PDFFIles/BillofCostsHandbook.pdf .......... 61

## Statement Regarding Oral Argument

There are multiple, independent, and straightforward grounds for affirming the district court's judgment and costs order. Oral argument is unnecessary.

## Statement of Jurisdiction

Defendant-Appellee Beaumont agrees with Plaintiff Garcia's statement of jurisdiction insofar as it correctly notes that Garcia's notice of appeal was filed within 30 days of the district court's February 7, 2022 final judgment (R. 102, PageID.1671) and its February 7, 2022 order denying Garcia's motion to review taxation of costs (R. 103, PageID.1672-1677). Further, the notice of appeal identifies both the judgment and that order (*see* R. 104, PageID.1678-1680).[1] This Court thus has jurisdiction to hear the appeal.

[1]Beaumont disagrees with Garcia's jurisdictional statement to the extent that it suggests Garcia raised meritorious claims.

## Statement of Issues Presented

1. **Sexual Harassment.** In co-worker sexual harassment cases, an employer is not liable if it promptly investigates alleged harassment, and its response is reasonably calculated to end the harassment. The complainant's dissatisfaction with the employer's response is irrelevant. Here, Beaumont promptly investigated Garcia's complaint that Luca harassed her, and—although it could not confirm the accusation—it counseled and warned Luca, ending further sexual harassment. Was Beaumont's response adequate?

2. **Sex Discrimination.** In various contexts, this Court has held that a party may not artfully plead claims to avoid controlling law. Garcia's disparate treatment sex discrimination claim rests on the premise that Beaumont's harassment investigation was inadequate because it did not fire Luca—something this Court has held cannot create employer liability in the hostile-environment context. Should this Court deny Garcia's "investigatory dissatisfaction" claim, recast as a disparate-treatment allegation, for this reason or on the merits?

    a. A disparate-treatment claim requires adverse action. Garcia alleges constructive demotion, which requires "intolerable conditions." But Garcia voluntarily resigned as lead therapist *months* after Luca had been fired, based on her fear that Luca *might* be rehired and that she *might* have to work a shift with Luca. Because her speculative fears that she might have to work with Luca do not create "objectively intolerable" conditions, has Garcia failed to establish adverse action?

    b. A disparate-treatment plaintiff must also show that *she* was treated differently than someone outside her protected class. Garcia's theory is not that *she* was treated differently than a man, but that *Luca* was treated differently than a hypothetical man that Garcia posits would have been fired for sexual harassment. Because Garcia cannot show that she was treated differently, has she failed to establish disparate treatment?

c. A disparate-treatment plaintiff must also show that the employer's stated reason for its actions were false and pretext for discrimination. Here, Beaumont explained that it did not fire Luca for sexual harassment because its investigation was inconclusive. Garcia ignores the pretext element in her brief and does not argue that Beaumont's reason for not firing Luca was false and pretext for discrimination *against Garcia*. Has Garcia failed to establish pretext?

3. **Retaliatory Harassment.** In co-worker retaliatory harassment cases, a plaintiff must show severe or pervasive harassment that was condoned or tolerated by the employer. Here, the "retaliation" was merely Luca's denials of Garcia's sex assault allegation—allegations that Garcia herself spread in the workplace. After Garcia complained, Luca was punished and she ceased defending herself. Because Luca's conduct was not severe or pervasive retaliation, and because Beaumont did not tolerate it, has Garcia failed to establish her retaliation claim?

4. **Denial of Default Judgment.** It is improper to issue a default judgment against one co-defendant when the other prevailed on the merits of a joint claim. And a default, at best, results only in the defaulting party's admission to well-pled facts, not to the legal relief sought. Because Luca's alleged act of defending herself against Garcia's allegations is not severe or pervasive retaliation, did the district court correctly refuse to enter an inconsistent default judgment against Luca for retaliation?

5. **Taxation of Costs.** A district court has wide discretion to interpret its own local rules. Here, the district court found that Beaumont's taxation of costs for transcripts used in a reply brief, and various line items in transcript invoices, were authorized by the rules. When, as here, the challenging party fails to even identify the correct standard of review, let alone argue it, should the Court affirm the district court's discretion in awarding costs?

## Introduction

Plaintiff-Appellant Kristina Garcia reported to a Beaumont supervisor that co-worker Rachel Luca grabbed her breast. Beaumont immediately investigated. Luca denied the assault, as did the sole eyewitness to the event. Because the investigation did not confirm Garcia's accusation, Luca was only counseled and warned. Garcia concedes no sexual misconduct occurred afterward.

Garcia then complained of "retaliation" when Luca denied Garcia's accusations in conversations with co-workers—accusations Garcia admittedly spread in the workplace herself. Beaumont again investigated, and punished Luca for violating an earlier directive to stop discussing the matter. The "retaliation" ended. Soon after, Luca was fired for unrelated reasons. Garcia remains at Beaumont to this day.

Garcia's theory of the case, boiled down to its essence, is two-fold: (1) that an employer must pay damages when its prompt investigation does not confirm a complainant's accusations—even when the investigation admittedly prevented any future sexual harassment; and (2) that an employer should likewise pay damages if the accused employee defends herself against the accusations that the plaintiff

herself spread in the workplace, because defending oneself against even *unsubstantiated* accusations is itself supposedly wrongful.

These assertions misconstrue an employer's obligations under the law, which is to prevent workplace harassment. An employer need not act as a kangaroo court, doling out punishment based on a mere allegation while ignoring eyewitness evidence and silencing the accused. And it does not allow employees to ask a court or jury to second-guess investigatory conclusions that do not end in a finding of guilt, especially when the investigation gave the complainant what she had a right to seek: an end to future sexual harassment. The district court correctly granted summary judgment on Garcia's claims.

## Statement of the Case

### I. Factual Background.

#### A. Garcia's work as a respiratory therapist.

Plaintiff-Appellant Garcia currently works at Beaumont Royal Oak Hospital as a respiratory therapist, and has since April 2011. R. 72-2, Pl's Dep. 54-56, PageID.913. Respiratory therapists are generally assigned to work in pairs throughout the hospital's four towers. R. 72-3, Carroll Decl. ¶ 3, PageID.1087. They report to one of four supervisors, with those

supervisors reporting in turn to Respiratory Director Jean Aphram. R. 72-2, Pl's Dep. 59-60, PageID.913-914.

Garcia also worked as a Charge Therapist from January 2017 until she voluntarily stepped down from that role on February 28, 2019. R. 72-3, Carroll Decl. ¶ 5 & Ex. 1, PageID.1087, 1092. Charge Therapists act as a lead when a supervisor is not onsite, such as midnights and weekends. R. 72-2, Pl's Dep. 79-80, PageID.919. Charge Therapists respond to staff needs and adjust work assignments for Respiratory Therapists as work demands. They may handle specific issues that may arise during a shift, or may assign someone else to handle the issues. *Id.*

### B. Garcia has a long amicable relationship with fellow respiratory therapist Rachel Luca, a co-worker with no history of sexual harassment complaints.

Defendant Rachel Luca was Garcia's coworker and a fellow Respiratory Therapist. R. 72-4, Dixon Decl. ¶ 7, PageID.1095. Luca was hired after an extensive background check that confirmed she had no criminal history and positive job references. *Id.* Until Garcia's complaint (*see infra* at 7), neither management nor Human Resources had ever received complaints about Luca engaging in sexually inappropriate conduct or communication. *Id.*; R. 72-3, Carroll Decl. ¶ 7, PageID.1088.

Garcia and Luca had an amicable relationship for three years. R. 72-2, Pl's Dep. 90, PageID.922. They talked at work, often had breaks together, and Garcia performed favors for Luca outside of work. *Id.* at PageID.922-923, 937. Garcia described the respiratory department on midnights as a playful atmosphere, in which she and others used foul language and held inappropriate conversations. *Id.* at PageID.933-934, 969. She did not find this atmosphere to be offensive, including Luca's allegedly "strange" behavior, until a July 2018 incident described below. *Id.* at PageID.924, 933-934, 969.

### C. Three years into their friendship, Garcia accuses Luca of "sexual assault" a week after it allegedly happened.

On August 6, 2018, Garcia complained about Luca to day-shift supervisor Antoinette "Net" Carroll, and surreptitiously recorded the conversation. R. 72-2, Pl's Dep. 148-149, 201-206 & Exs. 5, 7, PageID.936-937, 950-951, 991-992, 1000-1013. *Id.* Garcia told Carroll that a week earlier, Luca reached under Garcia's scrubs, into her bra, lifted her breast from the bra cup, and pinched her nipple. *Id.* Garcia claimed it occurred in a storage room on the East Tower's 3rd floor where Garcia, Luca, and coworker Colleen Kaye gathered to take their break. *Id.* at PageID.929, 937-946, 991-992, 1014.

According to her statement, Garcia had told Luca and Kaye that she was wearing a PPE gown over her scrubs because she was "freezing and you can see my nips through my bra." *Id.* at PageID.944. The three then started discussing bras and their preferred bra type. *Id.* at PageID.945. Luca and Kaye asked Garcia if she had a bra like theirs and pulled out their shoulder straps to show her. *Id.* Garcia said she did not and pulled out her bra strap. *Id.* Garcia claims Luca then stood up, walked over, and put her hand down Garcia's shirt, pinched Garcia's left nipple and lifted Garcia's breast from its bra cup. *Id.*

Garcia claims she was "pissed off" and told Luca "that's too fucking far." *Id.* at PageID.946-947. Garcia did not stand up, grab Luca's hand, or stop her in any way. *Id.* Nor did she immediately leave the room, call security, or the police. *Id.* And she did not notify any supervisors or the Charge therapist. *Id.* Instead, Garcia testified that she "just moved on" and "didn't do anything about it." *Id.* The conversation continued for a while after the alleged assault before they all returned to work. *Id.*

Later in the shift, after the alleged assault, Garcia again met with Luca and other coworkers in the storage/breakroom. R. 72-2, Pl's Dep. 194-201, PageID.948-950. Luca allegedly had a conversation about how

vaginas change after childbirth, and that hers was still beautiful even after having kids. *Id.* Luca then allegedly insinuated that she planned to take down her scrubs to show them. *Id.* Garcia claims Kaye told Luca something like "you're crazy, knock it off." *Id.* Then Luca purportedly started googling vaginal infections and showed Garcia her phone. *Id.*

### D. At Garcia's request, respiratory therapist supervisor Net Carroll is chosen to investigate the allegations.

Carroll was shocked and concerned by Garcia's allegations. R. 72-5, Carroll Dep. 50 & Exs. 5, 7, PageID.1156, 1178-1179, 1181. Throughout their initial conversation, Garcia requested that Luca not be disciplined or terminated and that the matter be handled by Carroll, and not Human Resources. *Id.* at PageID.950-952 & 1005 ("[I]f I go to HR, I feel like they'll take it out of my hands and say, oh, [you] have to do something.") Garcia explained to Carroll that "I'm not afraid of her" and "I don't think she'll do it again or anything like that." *Id.* at Ex. 7, PageID.1005.

Carroll consulted Beaumont's sexual harassment policy, discussed the complaint with her manager Jean Aphram, and notified HR. R. 72-5, Carroll Dep. 38-39, 66, PageID.1153, 1160; R. 72-6, Aphram Dep. 31-33, PageID.1212. HR directed Carroll to obtain Garcia's written complaint and to investigate. R. 72-3, Carroll Decl. ¶ 9, PageID.1088; R. 72-6,

Aphram Dep. 33, PageID.1212. Garcia understood that Carroll would investigate and approved of that decision. *Id.* at PageID.952.

Carroll asked Garcia to prepare a written complaint, which she did two days later. R. 72-2, Pl's Dep. 211-212 & Ex. 5, PageID.952, 991-992. That statement addressed the alleged touching incident, and contained new allegations that Luca had made comments, months earlier, that led Garcia to believe that Luca had a sexual interest in her. *Id.* Garcia's statement ended with a request that she and Luca "not be paired together in an ICU where we could possibly be alone in our supply room where we do a lot of our charting." *Id.*

### E. Carroll promptly investigates and learns that the only eyewitness to the alleged incident denied that Luca touched Garcia inappropriately.

On August 8, 2018, Carroll began investigating by interviewing Luca and eyewitness Kaye. R. 72-3, Carroll Decl. ¶ 10, PageID.1088. Carroll arranged her interviews so that the two could not discuss the matter prior to individually speaking with her. *Id.* Both stated that the three of them had been discussing bras. R. 72-5, Carroll Dep. 52-53 & Ex. 5, PageID.1156, 1178-1179. Luca stated that she accidentally touched Garcia when Garcia showed her bra strap and Luca touched the strap's

fabric. *Id.* But both Kaye and Luca denied that Luca had reached into Garcia's bra and grabbed or touched Garcia's breast or nipple. *Id.*

Luca, however, told Carroll that Garcia had made false and inappropriate comments that were making her uncomfortable. R. 72-5, Carroll Dep. 55 & Dep. Ex. 5, PageID.1157, 1178-1179. Luca said that *Garcia* had brought up her nipples in their conversation, and then later made comments in the staff room that Luca "grabbed her nipple because she was into girls." *Id.* Dianna Grayson, another coworker, confirmed that she heard "someone" say that "Rachel grabbed my nipple because she is into girls." *Id.* Garcia later admitted that she had, in fact, made these accusations about Luca to co-workers, in Luca's presence. R. 72-2, Pl's Dep. 123-126, PageID.930-931. Luca declined, however, to submit a written complaint herself. R. 72-5, Carroll Dep. 55, PageID.1157.

### F. Carroll counsels and warns Luca, and Garcia admits that this response was satisfactory and that no further sexual communications occurred.

On August 13, 2018, Carroll met Garcia and Luca separately to discuss the investigation's outcome. R. 72-5, Carroll Dep. 64-65 & Ex. 5, PageID.1159, 1178-1179; R. 72-3, Carroll Decl. ¶ 13, PageID.1089. She told them Garcia's assault allegation was not substantiated. *Id.* Carroll,

though, documented her investigation and issued a warning. *Id.* Carroll told Luca and Garcia that there was to be no inappropriate conversations, touching, or behavior going forward. *Id.* Carroll also directed both to treat the investigation and its subject matter confidentially. *Id.*

Garcia admitted that she was "accepting" of this result. R. 72-2, Pl's Dep. 267-68, 280-81, PageID.966, 969-970. She did not interact with Luca after the alleged incident, and Luca did not engage in any alleged sexual conduct or communications again. *Id.* at PageID.964, 972. Garcia and Luca were never again paired together for work assignments. *Id.*

### G. Garcia complains that Luca's denials of Garcia's self-publicized accusations is "retaliation."

On August 27, 2018, Garcia complained to Carroll that Luca was "retaliating" by talking to coworkers about Garcia's accusation and denying that she had sexually assaulted Garcia as Garcia had been telling them.[2] R. 72-2, Pl's Dep. 238-39, 266-67, PageID.959, 966. To support her complaint, Garcia played part of a secretly recorded conversation with coworker Phil Matthewson. *Id.* & PageID.1021-1034.

[2]Garcia repeated her accusations to several co-workers before Luca started defending herself, including David Antior, Stacy Cary, Tonirose Cudilla, and Dianna Grayson. R. 72-2, Pl's Dep. 123-129, 226-28, PageID.930-932, 956; R. 72-5, Carroll Dep. Ex. 5, PageID.1178.

The full recording reflects Matthewson stating that Luca, while "venting" on several topics, said she had been falsely accused of pulling out Garcia's "boob." *Id.* at PageID.1021. After further discussion, Garcia told Matthewson, "She' s saying I'm a liar. No, she is a liar." *Id.* at PageID.1026. Garcia then told Matthewson, in detail, her accusations against Luca.[3] *Id.* at 1030-1031.

After Garcia's retaliation complaint, Carroll's manager Aphram, contacted HR and was told to interview Luca. R. 72-6, Aphram Dep. 55 & Ex. 6, PageID.1218, 1239. Luca was not working that day, and did not work during business hours until September 7, 2018. R. 72-3, Carroll Decl. ¶ 17, PageID.1090. On September 7, Aphram met with Luca. *Id.*; R. 72-7, Aphram Decl. ¶ 3, PageID.1261. Luca denied talking about the incident and claimed that Garcia had been the one falsely accusing her of misconduct. *Id.* Aphram told her that Human Resources had been consulted and they were awaiting further direction as to next steps. *Id.*

On Monday, September 10, 2018, Garcia emailed a complaint to Human Resources and upper management. R. 72-2, Pl's Dep. 265-66 &

[3]Garcia also discussed the matter, post-investigation, with Cary, Antior, and Angelia Serratos. R. 72-2, Pl's Dep. 148, 222-25, 241-47, 252 & Ex. 11, 13, PageID.936, 955-962, 1036, 1039.

Ex. 15, PageID.966, 1047-1049. This complaint revisited the alleged assault and added the alleged "retaliation" by Luca. *Id.* The email recipients immediately responded, with HR representative Kevin Brancaleone asking Garcia to call him. R. 72-2, Pl's Dep. 272-73 & Ex. 16, PageID.967-968, 1050. Garcia declined, stating that she was on vacation and would call him when she returned on September 27. *Id.*

Garcia then had her lawyer send an "affidavit" recounting her allegations and stated she would not return to work. *Id.* at PageID.968-969, 1052-1055. After the vacation, she took FMLA leave but ultimately returned in October 2018. *Id.* at PageID.968. Garcia refused to discuss her complaint with HR or management unless her lawyer was present—something prohibited by Beaumont policy. *Id.* at PageID.963; R. 72-4, Dixon Decl. ¶ 16, PageID.1097.

### H. Beaumont investigates the "retaliation" claim and disciplines Luca for disregarding Carroll's instruction not to discuss confidential investigations.

Despite Garcia's failure to cooperate, Beaumont continued to investigate Luca's "retaliatory" conduct. R. 72-4, Dixon Decl. ¶¶ 15-20 & Ex. 7, PageID.1097-1098, 1127-1136. The investigation revealed that Luca had violated Carroll's directive and had talked to coworkers Phil

Matthewson, Angelita Serratos, and Anthony Stout about Garcia's assault allegations. *Id.* ¶ 21 & Ex. 7, PageID.1098, 1127-1136. On October 9, 2018, management and HR prepared written discipline for Luca. *Id.* ¶ 22 & Ex. 8, PageID.1099, 1137-1142; R. 72-6, Aphram Dep. 73-76 & Ex. 13, PageID.1222-1223, 1252. Luca's supervisor administered the discipline when Luca next returned to work. *Id.* Luca cried, claiming that she was the one bullied by Garcia's false allegations. *Id.*

Garcia reported no other complaints about Luca. R. 72-2, Pl's Dep. 257, 260, PageID.964. Beaumont honored Garcia's request and never paired her to work with Luca on any assignment after Garcia's initial August 6 complaint. *Id.* Garcia admittedly had no further interaction with Luca. *Id.*; R. 72-3, Carroll Decl. ¶ 4, PageID.1087.

### I. Garcia steps down as a Charge Therapist two months after Luca is terminated for failing to report to work.

Garcia continued to be assigned Charge Therapist duties after Luca's discipline, but was scheduled to do so only twice at the same time Luca was working. R. 72-2, Pl's Dep. 260-64, PageID.964-965. She never interacted with Luca on either occasion. On one of the two occasions, Garcia asked to be relieved of charge therapist duties, and the request was accommodated. R. 72-2, Pl's Dep. 262-64, PageID.965. On the other

occasion, Garcia did not request to be relieved of Charge responsibilities and then worked the shift without interaction with Luca. *Id.*

Luca last worked at Beaumont on November 30, 2018, and her employment was terminated December 11, 2018 for failure to report to work. R. 72-4, Dixon Decl. ¶ 7, PageID.1095. On February 28, 2019—more than two months *after* Luca was terminated from Beaumont—Garcia stepped down from her Charge Therapist duties, citing "health concerns" with no mention of Luca. R. 72-2, Pl's Dep. 326 & Ex. 19, PageID.1061, 1081.

## II. Relevant Procedural History

On June 6, 2019, Garcia filed this three-count federal lawsuit. *See* R. 1, Complaint, PageID.1. She alleged (1) Title VII disparate treatment based on sex; (2) Title VII disparate treatment based on her sexual orientation as a bisexual woman; and (3) a Title VII retaliation claim. *Id.* She later amended her complaint to add a Michigan Elliott-Larsen disparate-treatment claim based on sex, and an Elliott-Larsen retaliation claim. R. 28, First Am. Compl., PageID.150.

After the close of discovery, Beaumont moved for summary judgment on Plaintiff's claims. R. 72, Mot. for Summ. J., PageID.861. The

district court agreed, granting summary judgment. R. 86, Opinion and Order, PageID.1513-1550. Beaumont filed a bill of costs. R. 90, PageID.1570-1579. The clerk taxed costs in Beaumont's favor. R. 91, PageID.1580. Garcia then moved to review the clerk's taxation. R. 96, PageID.1607-1620. The Court denied the motion and affirmed the taxed bill of costs. R. 103, Opinion and Order, PageID.1672-1677.

The Court also denied a motion for default judgment against Defendant Luca and dismissed the claims against Luca with prejudice, for the same reasons summary judgment was granted to Beaumont. R. 101, Opinion and Order, PageID.1666-1670. The Court thus issued a judgment dismissing the entire amended complaint. R. 102, PageID.1671. Garcia now appeals the judgment and the taxation order.

## Standard of Review

This Court reviews the district court's grant of summary judgment de novo. *See Ellington v. City of E. Cleveland*, 689 F.3d 549, 552 (6th Cir. 2012). Summary judgment is appropriate if the moving party shows there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

The order affirming the clerk's taxation of costs in Beaumont's favor is reviewed for abuse of discretion. *Singleton v. Smith,* 241 F.3d 534, 538 (6th Cir. 2001). "Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Bowling v. Pfizer, Inc.,* 102 F.3d 777, 780 (6th Cir. 1996).

## Summary of Argument

Garcia, on appeal, challenges the district court's grant of summary judgment on (1) her sexual harassment claim; (2) her sex/sexual orientation discrimination claim; and (3) her retaliation claim. She also challenges the district court's taxation of costs. All her arguments fail.

**1. Sexual Harassment.** In cases involving alleged sexual harassment by a co-worker, an employer is liable only if it knew or should

have known of the harassment, and failed to take prompt and appropriate corrective action. A response is generally adequate if it is reasonably calculated to end the harassment, even if the harassment does not end. But if the response does end the harassment, as it indisputably did here, it is adequate. The complainant's subjective dissatisfaction with the investigation's outcome, or the level of discipline imposed, is not relevant.

Under these principles, Beaumont's prompt investigation of Garcia's sexual harassment claim was adequate. Although it could not confirm Garcia's claim—because both Luca and an eyewitness denied Garcia's allegations—it still counseled and warned Luca. Garcia admits that no further sexual harassment occurred afterward. That is sufficient for Beaumont to avoid liability, even though Garcia is upset that Beaumont did not disbelieve Luca and the eyewitness to find Luca guilty. Further, the district court correctly excluded Garcia's speculative affidavit that Beaumont knew of earlier alleged misconduct by Luca—an affidavit that is irrelevant anyway because it did not reflect Luca's alleged harassment of *Garcia*. Finally, Garcia's claim that Beaumont's response was inadequate because Luca "retaliated" is meritless; this

Court has refused to commingle alleged sexual harassment and retaliatory harassment as they are separate wrongs motivated by different types of animus.

**2. Sex Discrimination.** Garcia alleges sex and sexual orientation discrimination on the theory that Beaumont would fire a hypothetical man who sexually harassed Garcia, but did not fire Luca, for the same conduct. Her premise is faulty, because Beaumont did *not* find that Luca sexually harassed Garcia—and thus there is no basis to compare Luca with a hypothetical male who was found to have committed harassment. But this argument is merely a repackaged attempt to hold Beaumont liable based on Garcia's dissatisfaction with Beaumont's investigation results. It should be denied for that reason.

In any event, Garcia's discrimination claim is meritless on its face.

*First*, she suffered no adverse action; all she can point to is her inexplicable decision to voluntarily resign as a charge therapist two months *after* Luca was fired. She claims this was constructive demotion, but such a claim requires "objectively intolerable" conditions, and Garcia's speculative fear that Luca *might* be rehired and Garcia *might*

work a shift as charge therapist during a future shift by Luca (if rehired) is not "objectively intolerable."

*Second*, Garcia cannot show that *she* was treated differently than a comparable person of a different sex or orientation. Rather, her claim is that *Luca* was treated differently than a hypothetical man.

*Third*, Garcia cannot show that Beaumont's reason for not firing Luca—that Garcia's allegations were not substantiated—was false and pretext for discrimination. In fact, she ignores this argument in her brief.

**3. Retaliatory Harassment**. Garcia cannot show that she suffered retaliatory harassment. The alleged retaliation—Luca's denials of Garcia's accusations that Garcia herself spread in the workplace—is not severe or pervasive retaliation by Luca. And even if it were, Beaumont promptly investigated Garcia's complaint of retaliation and disciplined Luca, which ended the "retaliation."

**4. Taxation of Costs**. Finally, Garcia appeals from the district court's order affirming the taxation of costs. The district court, which has broad discretion to interpret its own local rules, held that Beaumont's taxed bill was authorized by the local rules and in line with other cost awards. It did not abuse its discretion.

## Argument

Although cast under different legal theories, Garcia's arguments all echo the same theme: (1) that Beaumont should be liable for Luca's alleged sexual harassment because its investigation improperly failed to conclude that Luca was guilty of sexually assaulting her, even though that investigation ended the alleged sexual harassment; and (2) that Beaumont should be liable for "retaliation" because Luca denied Garcia's accusations, even though Beaumont punished Luca for discussing the matter and ended the alleged "retaliation."

But as described Garcia's sex claims fail because Beaumont's investigation stopped any future alleged harassment. And the retaliation claim fails because Luca's denials of Garcia's self-publicized accusations is not retaliation, and even if it were, Beaumont investigated and ended the alleged "retaliation" once Garcia complained.

### I. Beaumont's investigation prevented sexual harassment by Luca, and that—not Garcia's newfound dissatisfaction with the investigation—is the dispositive issue for her claim.

A year ago in *Doe v. City of Detroit*, this Court reiterated the legal principles applicable to a co-worker sex harassment claim under both Title VII and Elliot-Larsen. 3 F.4th 294, 304 (6th Cir. 2021) (holding that

the Title VII and Elliot-Larsen hostile environment analyses are "identical"). An employer is liable only if it "knew or should have known about the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Id.* at 301. An employer's response is generally adequate "if it is reasonably calculated to end the harassment." *Id.* The "most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Id.* This action precludes liability, even if the investigation is inconclusive. *Id.* Thus, an employee's dissatisfaction with the scope of an investigation cannot create liability. *Id.* at 302. Moreover, a "harassment victim may not dictate an employer's action against a co-worker." *Id.* at 302-303.

Applying this law, the *Doe* Court held that an employer was not liable for co-worker sexual harassment even though harassment continued despite *three* inconclusive investigations that all failed to identify an anonymous harasser. *Id.* at 301-04. The Court so held because the investigations were reasonable, albeit ineffective. *Id.* Given this result, it is unsurprising that Courts routinely hold that where an employer's investigation and response *successfully* ends the sexual

harassment, it *is* adequate. *See id. at* 303-04 (noting that even actions with the "inadvertent effect" of ending harassment renders employer response appropriate); *Fleenor v. Hewitt Soap Co.*, 81 F.3d 48, 51 (6th Cir. 1996) (holding, at pleading stage, that employer could not be liable for co-worker harassment when "by plaintiff's own admission, the sexual conduct stopped" after investigation and reprimand); *Andreoli v. Gates*, 482 F.3d 641, 644 & n.2 (3d Cir. 2007) ("A remedial action that stops the harassment is adequate as a matter of law.") (citing cases); *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 688 (6th Cir. 2005) (recognizing that under "Michigan law, the critical test of whether the employer's corrective action was adequate is whether it stopped the harassment").

Given these principles, the district court correctly held that Garcia failed to establish a claim of co-worker sexual harassment. R. 86, PageID.1541-1549. The court held that there was no evidence that Beaumont was aware of Luca sexually harassing Garcia (or anyone else) before Garcia's complaint. *Id.* It was undisputed that Beaumont immediately investigated Garcia's complaint by interviewing all three people present when the alleged assault occurred. *Id.* Although the investigation was inconclusive—both Luca and third-party witness

Colleen Kaye denied that Luca acted inappropriately—Beaumont still counseled and warned Luca not to engage in sexual communication nor conduct. *Id.* Garcia admits that Luca never engaged in sexual communication or conduct again. *Id.* Beaumont's investigation was effective in stopping the complained-of harassment. And none of Garcia's arguments overcome the dispositive law cited above.

### A. Garcia's claim that Beaumont is liable because it did not verify her allegations has no legal support.

Garcia first argues that Beaumont did not take "appropriate remedial action" because the investigator did not consider that Luca is supposedly a liar and that third-party witness Kaye allegedly changed her story.[4] App. Br. 30-31, 32-33. Despite her contemporaneous belief that the investigation's outcome was acceptable to her, *supra* at 12, she has now changed tack and claims dissatisfaction. Her theory is that

---

[4]Contrary to what Garcia implies, Kaye's two statements were consistent that she did not witness an alleged sexual assault. *See* R. 72-5, Colleen Dep. Ex. 5, PageID.1178 ("I didn't see Rachel touch/grab Kryssie's breast"); R. 72-6, Aphram Dep. Ex. 8, PageID.1243 ("I did not see anyone touched inappropriately"). And the suggestion (App. Br. 25-26) that it is somehow "contradictory" for Carroll to have believed Garcia was truthful prior to investigating—but to later question Garcia's claim after an investigation revealed evidence tending to exonerate Luca—defies logic.

Beaumont should be held liable because it reached the "wrong" decision in its investigation and should have credited Garcia's statement. *See id.*

Garcia's argument conflicts with the Sixth Circuit law cited above. Even an inconclusive investigation that begins shortly after a complaint is ordinarily sufficient to preclude employer liability, and it *is* adequate if it prevents future sexual harassment. *Supra* at 22-24.

The authority Garcia cites does not hold otherwise. *Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321 (6th Cir. 2008) involved an admitted sexual harasser who was terminated, later reinstated after a grievance, and then harassed three more women before being fired again. *Id.* at 327-331. This Court, reasoning that an "employer's responsibility to prevent future harassment is heightened where it is dealing with a known serial harasser," found the employer's response to the *third* victim's complaint inadequate where it merely accepted the serial harasser's denials and took no action—not even counseling—but instead transferred the *complainant* to a different location *Id.* at 341-344. And *Smith v. Rock-Tenn Services, Inc.* involved an employer that took no action for 10 days against an employee it had just disciplined for harassment two months

earlier, and forced the victim to continue working with the harasser until he suffered a mental breakdown. 813 F.3d 298, 311-312 (6th Cir. 2016).

As the district court found, those cases are plainly distinguishable. *See* R. 86, Opinion p. 36-37, PageID.1548-1549. There was no history of sexual harassment complaints against Luca, let alone substantiated complaints that established that Luca was a sexual harasser. There was therefore no history of Luca lying in sexual harassment investigations. Beaumont did not merely conclude its investigation by accepting the bare denial of a known harasser; it investigated and learned that the only eyewitness supported Luca's denial of misconduct. And even though the investigation was inconclusive, Beaumont did counsel Luca and no further harassment occurred. Beaumont fulfilled its duty under the law.

**B. Garcia's argument that a jury should second-guess the investigation results contravenes well-established policy.**

Besides disregarding Sixth Circuit law, Garcia's legal argument would create policy implications that defy fundamental notions of justice and fair play. Garcia argues, in effect, (1) that Beaumont had to suspend or otherwise disadvantage Luca based on Garcia's accusation alone, App. Br. 32; and (2) that because the investigator did not confirm Garcia's accusations, a jury should be able to second-guess the conclusions and

inferences that Beaumont's investigator drew, *see* App. Br. 26 & 33 (claiming, for example, that "the issue of Ms. Carroll's refusal to consider the statements by Ms. Luca and her friend, Ms. Kaye, as suspicious, is a disputed issue of fact" precluding summary judgment).

If that were the law, the only way that an employer could effectively avoid a jury trial in a co-worker harassment case would be to apply summary punishment based on the accuser's say-so alone. Any investigation—even one uncovering exculpatory evidence—resulting in no finding of fault would, for that very reason, be suspect. Garcia's rule would require juries to perform hindsight micromanagement of every investigation that did not end in a guilty finding, and force the employer to pay damages if the jurors would have decided differently—even when the actual investigation ended future sex harassment.

But that is not the law. This Court has rejected the notion that the courts should sit as a "super personnel department" and "second guess an employer's facially legitimate business decisions," including the method and conclusions of investigations. *Hunt v. Monro Muffler Brake, Inc.*, 769 F. App'x 253, 257 (6th Cir. 2019); *accord Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1304 (11th Cir. 2007)

(refusing to "second guess investigations" based on investigator's failure to "give more weight to a particular factor" as improper judicial "micromanagement" of internal investigations).

Further, this Court and others have been sensitive to the employer's countervailing duties to protect the rights of the accused—who could themselves sue if terminated or otherwise disciplined over an unsubstantiated allegation. *See Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 874–75 (6th Cir. 1997) (recognizing that an employer cannot "realistically… ignore" the risk that it would be violating the civil rights of a Black man if it fired him due to an unsubstantiated harassment allegation from a White woman); *accord, e.g.*, *Swenson v. Potter*, 271 F.3d 1184, 1196–97 (9th Cir. 2001) ("As a matter of policy, it makes no sense to tell employers that they act at their legal peril if they fail to impose discipline even if they do not find what they consider to be sufficient evidence of harassment"); *Harris v. L & L Wings, Inc.*, 132 F.3d 978, 984 (4th Cir. 1997) ("The legal standard of 'prompt and adequate remedial action' in no way requires an employer to dispense with fair procedures for those accused or to discharge every alleged harasser"). Garcia's proposed rule runs afoul of all these policy considerations.

### C. Garcia has waived her challenge to the Court's exclusion of her affidavit—but, in any event, the affidavit is inadmissible and irrelevant to the issue of Beaumont's notice.

Garcia also argues that Beaumont had "prior notice" of Luca's misconduct, citing her own post-summary-judgment affidavit containing a laundry list of alleged Luca misconduct along with the bare assertion that the "conduct set forth above was well known to supervisors." App. Br. 31-32; R. 73-1, Garcia Aff., PageID.1304-1306. The district court rejected her argument, holding that Garcia's affidavit was inadmissible under Fed. R. Civ. P. 56(c)(4) (requiring affidavits to "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"). It held that Garcia's affidavit stated no facts substantiating the bare allegation that Beaumont supervisors knew of the described conduct, and her "belief or speculation as to what supervisors knew is not admissible to create a genuine issue of material fact." R. 86, Opinion p. 33, PageID.1545.

Garcia, tellingly, fails to address the substance of the district court's ruling. She does not deny that she lacks personal knowledge as to Beaumont supervisors' knowledge of any of the alleged conduct set forth.

*See* App. Br. 31-32. Instead, Garcia claims that *she* "experienced" the alleged misconduct by Luca. *Id.* But that ignores the district court's point: that Garcia did not have proof that *Beaumont* knew of earlier misconduct, and she still offers none. Because Garcia "does not address the district court's reasoning on appeal," she has abandoned her challenge to that ruling. *Smith v. Pallas*, No. 18-1933, 2019 WL 7946345, at *2 (6th Cir. Nov. 7, 2019). In any event, Garcia's argument fails on the merits.

**1. The district court properly disregarded the unsupported, speculative affidavit under Rule 56(c)(4).**

The district court properly excluded the affidavit under Rule 56(c)(4), because it did not establish a factual basis for the bare assertion that Beaumont was aware of Luca's alleged misconduct described there. This Court's decision in *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015), helps explain the point. There, it recited Rule 56(c)(4)'s requirements and the non-moving party's duty to show the existence of a genuine issue of material fact to avoid summary judgment. *Id.* It held that an affidavit opposing summary judgment must therefore be based on "knowledge" and not "belief." *Id.* Further, a "district court has discretion to determine whether it can differentiate between knowledge and belief for each averment in the affidavit." *Id.* If the district court can

differentiate fact from belief, it should admit only the parts based on personal knowledge and strike the rest. *Id.* But when the district court cannot tell from the affidavit what assertions are based in personal knowledge, it "must strike the affidavit in its entirety." *Id.*

Garcia's affidavit states, without explanation, that "the conduct set forth above was well known to supervisors," and then swears only that "[t]his information is true to the best of my knowledge, information, and belief." R. 73-1, PageID.1306. There are no facts in the affidavit explaining how the supervisors knew, or how *Garcia* supposedly knows that the supervisors knew. *See id.* It is hard to see how any reader could conclude, based on the paucity of these assertions, whether Garcia had a factual basis for these assertions or is just speculating. As a result, the district court did not abuse its discretion in concluding that the affidavit did not meet Rule 56(c)(4)'s personal knowledge requirements. The affidavit does not adequately show that Beaumont knew of Luca's alleged conduct.[5] *Ondo*, 795 F.3d at 605.

---

[5] Indeed, with one exception, nothing in the affidavit shows that Garcia had personal knowledge of Luca's alleged conduct either. Apart from Garcia's claim that Luca showed her a nude picture—which, per Garcia's own testimony, was not offensive, *supra* at 7—she does not say that she personally witnessed any of the incidents alleged. *See* R. 73-1, Garcia Aff.,

### 2. The affidavit, even if admissible, does not reflect that Beaumont had notice that Luca harassed *Garcia*.

The Court could alternatively affirm the district court's ruling because the affidavit—even if admissible—does not reflect the relevant notice here: that Luca harassed *Garcia* herself. *Garza v. Lansing Sch. Dist.*, 972 F.3d 853, 877 (6th Cir. 2020) (this "court can affirm a decision of the district court on any grounds supported by the record, even if different from those relied on by the district court"). Garcia's argument seems to be that Beaumont did not promptly take steps to prevent Luca's harassment *before* the alleged sexual assault occurred. App. Br. 31-32. This argument presumes that the "notice" she must show is Beaumont's knowledge of Luca's conduct as a general matter. *Id.* But that is incorrect.

Instead, the relevant notice is whether Beaumont knew that Luca had harassed *Garcia*—something Garcia said did not occur until the alleged touching incident. *Supra* at 7. As the *Doe* Court held, in a co-worker harassment case the question is whether the employer had notice of the "*charged* sexual harassment"—that is, the harassment of the plaintiff herself. 3 F.4th at 300 (emphasis added) (citing cases). Even in

---

PageID.1304-1306. Rather, she merely states she is "aware" of incidents involving co-workers—implying hearsay, not first-hand knowledge.

cases of constructive knowledge, the relevant question remains whether the employer should have known that the *plaintiff* was being harassed—not whether it should have known the harasser engaged in misconduct directed at other people.

*E.E.O.C. v. Harbert-Yeargin, Inc.*, 266 F.3d 498, 518 (6th Cir. 2001) is instructive. Like this case, it involved a same-sex groping allegation between coworkers. *Id.* at 502. No supervisors witnessed the groping, and there had been no prior sexual harassment complaints against the alleged groper. *Id.* at 518. The EEOC, though, argued that the "history of harassing behavior" by the alleged groper—including the supervisors' general awareness that he "goosed" other male employees—was sufficient notice. *Id.* at 503, 518. This Court disagreed, holding that such generalized knowledge was not enough to show employer notice that the plaintiff himself had been sexually harassed. *Id.* at 518. And other cases likewise confirm that the relevant notice—actual or constructive—is that the *complaining employee* suffered harassment. *See Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 489 (6th Cir. 2006) (holding plaintiff did not produce evidence sufficient to show "defendants had constructive notice that *she* was subjected to hostile environment harassment")

(emphasis added); *Calderon v. Ford Motor Credit Co.*, 300 F. App'x 362, 370 (6th Cir. 2008) (focusing on employer knowledge of "derogatory racial remarks made about and to [the plaintiff]"); *Sheridan v. Forest Hills Pub. Sch.*, 247 Mich. App. 611, 627 (2001) (same analysis under ELCRA).

So understood, Garcia's affidavit fails to establish that Beaumont should have been on notice of the *charged* sexual harassment—that is, that Luca had sexually harassed Garcia. Indeed, nothing in her affidavit reflects that Garcia herself was sexually harassed prior to the alleged touching; indeed, she herself admitted that she had no issues with Luca or her work atmosphere before the alleged touching. *Supra* at 7. Garcia could not have been sexually harassed by conduct personally inoffensive to her. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 568 (6th Cir. 1999) (sexual harassment requires employee to have "subjectively perceived her work environment to be hostile.") Ultimately, there was no prior harassment of Garcia for Beaumont to be on notice of.

Moreover, none of the "misconduct" identified reflects anything Luca did to Garcia herself, apart from Luca's allegedly showing Garcia a photo *once*. *See* R. 73-1, Garcia Aff. ¶ 4, PageID.1305. Even if this event occurred—an event that Garcia somehow neglected to raise in her

internal complaints, her complaint or amended complaint, or any sworn testimony before Beaumont filed a summary judgment motion—it was, as discussed, not harassment in Garcia's own mind. *See supra* at 7. And even if she now alleges otherwise, Garcia's affidavit does not state that supervisors knew Luca show Garcia the photo. *Id.* The affidavit does not create a genuine issue of fact as to whether Beaumont had actual or constructive notice that *Garcia* had been harassed before her complaining to Net Carroll on August 6, 2018.

### D. Garcia may not rely upon alleged "retaliation" to bolster her sexual-harassment claim.

Finally, Garcia invites this Court to hold that Beaumont did not promptly and adequately end the complained-of *sexual* harassment by pointing to alleged post-investigation "retaliation" by Luca—which she describes as Luca's "telling numerous coworkers that [Garcia] lied to get her fired." App Br. 34. But the district court correctly held that Garcia did not "identify any further instances of sexual harassment after the July 29 incident" and that the "retaliation" she alleges was not sexual harassment. R. 86, Opinion 34-35 & nn.10-11, PageID.1544-1545. And, indeed, this Court and others have rejected attempts by plaintiffs to conflate post-complaint retaliation with pre-complaint harassment.

This Court's decision in *Morris v. Oldham Cnty. Fiscal Ct.* illustrates the point. 201 F.3d 784 (6th Cir. 2000). There, the plaintiff complained of sex harassment, which led to the harasser being transferred and counseled not to contact the plaintiff again. *Id.* at 787-88. He repeatedly violated the directive, appearing at the plaintiff's office a dozen times, calling her repeatedly, and throwing nails in her home driveway. *Id.* As here, the plaintiff sought to include this post-complaint conduct into "the hostile working environment equation," but this Court said no. *Id.* at 790-91. Such retaliatory conduct, the Court noted, reflected displeasure with the plaintiff's complaints—and thus would fall within her retaliatory harassment claim, not her sexual harassment one. *Id.* at 791. As the First Circuit explained, in adopting the *Morris* rule, "retaliation is a distinct and independent act of discrimination, motivated by a discrete intention to punish a person… complaining about an unlawful employment practice." *Noviello v. City of Boston*, 398 F.3d 76, 87 (1st Cir. 2005); *accord Mast v. IMCO Recycling of Ohio, Inc.*, 58 F. App'x 116, 123 (6th Cir. 2003) ("discrimination and retaliation" are "two separate wrongs" and "must be argued as such").

Garcia does not argue (and could not plausibly argue) that Luca's allegedly telling co-workers that Garcia had made a false claim of misconduct against her was motivated by a sexual animus, rather than Luca's "personal displeasure" with Garcia's complaint. *Morris*, 201 F.3d at 791. Indeed, Garcia herself explicitly refers to Luca's post-complaint conduct as "retaliation" in the very same paragraph of her brief. *See* App. Br. 43. And Garcia herself repeatedly characterized the "retaliation" as Luca's calling her a liar and denying an assault occurred. R. 72-2, Pl's Dep. 226, 266, PageID.956, 966. Thus, even if Luca's self-defense could be considered "harassment" under the law—and it cannot, as discussed later—it would be retaliatory harassment. It is not proof that Beaumont failed to adequately remedy *sexual* harassment by Luca.

## II. Garcia may not recast her "investigatory dissatisfaction" theory into a disparate-treatment framework, but her claim fails under that framework too.

Garcia's disparate-treatment claim rehashes her argument that Beaumont's investigation was inadequate. Her theory follows from these premises: (1) Antoinette Carroll said that a man who sexually harassed a woman would lose his job; (2) Luca, a woman, did not lose her job; and (3) Beaumont thus did not follow "policy" because it did not fire Luca

when it would have fired a man. *See* App. Br. 25. Of course, the flaw in Garcia's logic is that Carroll did not say that Beaumont would fire a man *even if* an investigation were inconclusive, as happened here.[6]

At best, one might interpret Garcia to be arguing that Carroll would have reached different conclusions despite the inconclusive evidence if Luca had been a man. But as the district court held, "Garcia does not cite a single case suggesting that a plaintiff can prove disparate treatment by showing that the employer treated" *the alleged harasser* differently. R. 86, PageID.1535. And Garcia still does not cite a single case for that premise. *See* App. Br. 22-28. At bottom, Garcia's claim—despite being dressed in disparate-treatment clothing—attacks the adequacy of an investigation that admittedly prevented future sexual harassment.

---

[6]Garcia's argument is particularly disingenuous because Carroll (who was responding to Garcia's initial complaint, *before* she was assigned to perform a neutral investigation) made clear that if Luca had touched Garcia, it was sexual harassment even though they were both women:

> **Garcia:** "Because like I said Net, I'm really, if that was a man I would've hit him without thinking."
>
> **Carroll**: "Well, he would have been out of the job. He would have been gone. Because that's sexual harassment. *And guess what? It's sexual harassment on her part, too*."

R. 72-2, Pl's Dep. Ex. 7, PageID.1004 (emphasis added).

This Court has "declined to permit artful pleading to avoid both the requirements and consequences of a Title VII action," *N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n*, 900 F.2d 903, 913 (6th Cir. 1990), and in other contexts routinely rejects efforts to evade controlling law through artful pleading. *See, e.g.*, *Krafsur v. Davenport*, 736 F.3d 1032, 1039 (6th Cir. 2013); *Costantino v. TRW, Inc.*, 13 F.3d 969, 974 (6th Cir. 1994); *Terwilliger v. Greyhound Lines, Inc.*, 882 F.2d 1033, 1037 (6th Cir. 1989). Under similar reasoning, the Court should decline Garcia's novel attempt to avoid well-established law rejecting liability over dissatisfaction with co-worker harassment investigations, simply because she has recast those claims in a disparate-treatment framework.

But even accepting that disparate-treatment framework, the district court correctly held that she cannot establish such a claim here.

### A. Garcia cannot make out a prima facie case because her voluntary resignation was not an adverse job action.

As one of the prima facie elements of a disparate treatment claim, Garcia must show that "she suffered an adverse employment action." *Alexander v. Caresource*, 576 F.3d 551, 559 (6th Cir. 2009). An adverse action "constitutes a significant change in [the plaintiff's] employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits," and it typically "inflicts direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998).

Garcia cannot show that she incurred an adverse employment action taken because of her sex or sexual orientation. As in the district court, the only adverse action she alleges is her voluntary decision to resign as a charge therapist two months *after* Luca had been terminated. App. Br. 26. As the district court held, however, an "involuntary resignation" theory requires a showing both of "intolerable working conditions" *and* that the employer deliberately caused the conditions intending to cause the resignation. R. 86, Opinion, PageID.1532-1533; *see also, e.g.*, *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 814 (6th Cir. 2020) (recognizing both intolerable conditions and employer intent elements under existing Sixth Circuit precedent.) The district court's ruling should be affirmed for many reasons.

**1. Garcia abandoned her challenge to the district court's reasoning that she did not show Beaumont made a deliberate attempt to make her resign.**

Garcia's appeal brief does not address the district court's reasoning that there was no evidence of a deliberate effort by Beaumont to force her

to resign the charge therapist position. *See* App. Br. 26-28. By failing to "address the district court's reasoning on appeal," she has abandoned her challenge. *See, e.g.*, *Smith v. Pallas*, 2019 WL 7946345, at *2 (6th Cir. Nov. 7, 2019) (citing *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 311 (6th Cir. 2005)).

The EEOC, however, attempts to revive this issue in its amicus brief. Amicus Br. 9-13. It argues the Court should overturn its precedent requiring "deliberate effort" by the employer, citing language in a 2016 Supreme Court case—language this Court noted may be substantively inapplicable, or even dicta. *See Tchankpa*, 951 F.3d at 815-816. But as in *Tchankpa*, the appellant's procedural failures with respect to this issue means that this Court should not address it. *Id.* at 817. For while "an amicus may offer assistance in resolving issues properly before a court, it may not raise additional issues or arguments not raised by the parties." *Self-Ins. Inst. of Am., Inc. v. Snyder*, 827 F.3d 549, 560 (6th Cir. 2016). The district court relied on currently binding precedent, and Garcia did not challenge that precedent on the law or the facts. The EEOC cannot revive this abandoned issue for her, and its desire to overturn precedent must await a case in which the issue was preserved.

### 2. Garcia cannot show "objectively intolerable" conditions when she resigned two months after the alleged harasser had been terminated.

Garcia could not, in any event, show that the conditions that caused her to resign were "objectively intolerable to a reasonable person." *Deleon v. Kalamazoo Cnty. Rd. Comm'n*, 739 F.3d 914, 920-21 (6th Cir. 2014). To state the circumstances of Garcia's resignation is to show its objective unreasonableness. Garcia worried that Luca, who had been terminated, *might* get rehired and that Luca *might* be scheduled for the same shift where Garcia was the charge therapist. *See* App. Br. 27.

As a legal matter, it is not reasonable to quit a job over speculative future events before they come to pass. *Agnew v. BASF Corp.*, 286 F.3d 307, 310 (6th Cir. 2002) (rejecting constructive-discharge claim where plaintiff feared a termination that "was contingent on future developments, rather than being a present plan or decision."). And Garcia, for her part, does not dispute that it would be unreasonable to quit over speculative fears that Luca might be rehired.

Instead, she claims she did not know that Luca had been terminated, and that the district court improperly made a credibility decision when it held otherwise. App. Br. 27. Garcia is playing games

with the record. At deposition, Garcia unambiguously admitted that when she resigned as charge therapist, she *knew* Luca was in jail and not working, and she merely feared Luca might get her job back:

> I was concerned that Miss Luca was coming up for release from jail… and I kind of heard and thought she might be getting her job back at Beaumont…. I was afraid that I was going to be put in that position again if she resumed her employment at Beaumont, that I would be her charge therapist again, and I wanted to avoid that.

R. 72-2, Pl's Dep. 323-324, PageID.1060. The district court did not make a credibility finding; it quoted Garcia's record testimony and other record evidence to refute the assertion Garcia made *in her response brief* that she was unaware that Luca was not then working at Beaumont. R. 86, Opinion, PageID.1534 & n.7. A summary judgment motion, of course, cannot "be defeated by factual assertions in the brief of the party opposing it," let alone through assertions in a brief that contradict the actual record. 10A Wright, Miller, *et al.*, Federal Practice & Procedure § 2723 (4th ed.). As the district court held, there is no genuine dispute in the record on this point: Garcia admittedly resigned because she heard Luca "might" return to her job with Beaumont, and "if" that happened, Garcia might be her charge therapist again. Her resignation based on speculative future events was not objectively reasonable.

### 3. It is not objectively reasonable to transfer to avoid working with a co-worker who was investigated and whose alleged harassment ended.

Even if Luca *had* been employed at Beaumont and assigned to shifts with Garcia, it would not be *objectively* intolerable for Garcia and Luca to have to work together when—as here—Luca's alleged sexual harassment admittedly ended after an investigation and warning.

This Court and others have routinely held that employers do *not* need to automatically separate co-workers when one alleges harassment, let alone permanently, based on a mere complaint. *See, e.g.*, *Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744, 749 (6th Cir. 2008) ("Absent evidence of continued sexual harassment, we are unwilling to impose liability on [the employer] for failing to keep [the accuser and the accused] separated"); *Barnett v. Boeing Co.*, 306 F. App'x 875, 881 (5th Cir. 2009) (holding that assigning employee to work with harasser—who had been disciplined—was not an "adverse employment action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination"); *Baldwin*, *supra*, 480 F.3d at 1306 (holding employer properly fired employee for refusing to work with alleged harasser after inconclusive investigation; "the complainant does not get to choose the

remedy"); *Swenson v. Potter*, 271 F.3d 1184, 1192 (9th Cir. 2001) ("the Postal Service was not required to provide Swenson a Feiner-free workplace merely because she complained about him"); *cf. Coulson v. The Goodyear Tire & Rubber Co.*, 31 F. App'x 851, 858 (6th Cir. 2002) (finding employee's request for transfer "so that he will not be required to work with certain people" unreasonable).

It follows that, however subjectively unpleasant it may be, it is not objectively intolerable for an employee to work with someone who once, but no longer, engaged in offensive conduct. Indeed, the well-established case law that a complaining party does not get to dictate an employer's response or impose liability on an employer because of dissatisfaction with the investigation, *supra* at 23, would be meaningless if an employee could simply manufacture liability by labelling the post-investigation workplace "intolerable" because she did not get her desired result.

Moreover, here, Beaumont did take efforts to prevent Garcia and Luca from working together. Garcia admits she was not paired with Luca again after the alleged assault and did not "have any interaction with" Luca afterward. R. 72-2, Pl's Dep. 260, PageID.964-965. And she was only scheduled as a charge therapist *twice* when Luca was working; on

October 13, which was changed at Garcia's request, and on November 11, during which time she did not interact with Luca.[7] *Id.*

On appeal, she suggests that this was not enough because she *saw* Luca in the workplace, and speculated that they might have interacted in common areas even if Garcia were not a scheduled charge therapist. App. Br. 26-27. But this novel argument only serves to prove the unreasonableness of Garcia's resignation as a charge therapist, because that would not solve her alleged problem. Whether a charge therapist or not, as a Beaumont employee Garcia might have run into Luca by chance, while on a break or while performing non-charge-therapist duties.

Ultimately, Garcia's argument is that Beaumont did not provide her with a Luca-free workplace—something that would have required terminating Luca or reassigning her off-site, even though Beaumont's investigation could not establish sexual harassment by Luca. The irony is that Beaumont did, in fact, terminate Luca before Garcia's resignation

[7]Garcia claims the district court made a "factual misstatement" by saying she was only scheduled to work with Luca twice, alleging instead she was scheduled *five* times with Luca "from October 13, 2018 until December 9, 2018." App. Br. 26-27. Again, the misstatement is Garcia's. The three other dates she claims she was scheduled with Luca—December 7, 8, and 9 of 2018—all came *after* Luca's last day on November 30, 2018. R. 72-2, Pl's Dep. 296, PageID.973.

for other reasons. But even if Luca had not been terminated, Garcia would not have suffered objectively intolerable circumstances due to the possibility of chance workplace interactions with Luca. The district court correctly held that there was no adverse action.

### B. Garcia has failed to show that a similarly situated man received more favorable treatment.

Another element of a prima facie disparate treatment case is that others, similarly situated and outside the protected class, were treated more favorably than the plaintiff. *Alexander*, 576 F.3d at 559. The district court held that even if Garcia could show an adverse action, she "fails to show that Beaumont treated *her* differently than similarly situated individuals outside the protected class." R. 86, Opinion, PageID.1534. For even accepting Garcia's premise that she can sue over alleged gender differences in how the *accused* are treated, Garcia "lacks evidence to show that Beaumont has treated similarly situated male harassers differently than it treated Luca." *Id.* In so doing, the Court held that Carroll's pre-investigation statement that a man touching a woman's breast would be sexual harassment was not proof Beaumont "treated similarly situated male employees more harshly" than Luca. *Id.* at 1535.

Garcia's appellate brief does not specifically address the district court's reasoning that Carroll's pre-investigation statement is not proof that Beaumont subjected actual accused male and female harassers to different standards. She has thus abandoned the issue. *See Smith*, *supra*, 2019 WL 7946345, at *2. Nor could she have raised any cogent response to this reasoning. In her appellate brief, Garcia again references Carroll's statement, this time with the added gloss of calling Carroll's statement "direct evidence." App. Br. 28. Garcia's argument, however, continues to ignore that Carroll's statement was about a hypothetical situation: that a man who touched a woman's breast would be fired for sexual harassment. *Supra* at 38-39 & n.6. But Luca was not found to have touched Garcia's breast, and thus she is not similarly-situated to this hypothetical man who was found guilty of the charged harassment.

Rather, a similarly situated person to Luca would be someone of a different sex or sexual orientation who was investigated for sexual harassment that could not be substantiated. Garcia identified no such person, let alone someone who was treated differently than Luca following an inconclusive investigation. And Beaumont introduced record evidence that it would not treat employees differently based on sex or

sexual orientation if an investigation did not confirm the charges. R. 72-4, Dixon Decl. ¶ 14, PageID.1097. Garcia has failed to establish this element of her prima facie case as well.

### C. Garcia cannot show that Beaumont's legitimate business reason for its level of discipline to Luca is false and pretext for unlawful sex discrimination.

Finally, even if Garcia could establish a prima facie case, she cannot show that Beaumont's reason for not terminating Luca was false and pretext for sex discrimination. *See Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Garcia does not address the pretext prong in her appellate brief. But she could not establish pretext regardless.

Simply put, Beaumont did not terminate Luca because Garcia's allegations were not substantiated. R. 72-4, Dixon Decl. ¶ 12, PageID.1096. While Garcia may disagree with Beaumont's conclusion and the discipline administered to Luca, her disagreement does not magically taint Beaumont's decision-making with discriminatory bias. This is a quintessential dispute over the employer's business judgment, which the courts have repeatedly held does not establish pretext. *See, e.g.*, *Chen*, 580 F.3d at 401. For this reason too, her claim fails.

## III. The district court correctly granted summary judgment on the retaliatory harassment claims.

Last year, this Court reaffirmed that under Title VII, the "standard for actionable harassment is the same in the retaliation context as in the sexual … discrimination context." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 426 (6th Cir. 2021) (internal quotation marks omitted). A plaintiff "must demonstrate that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Id.* (internal quotation marks omitted).

Even if an employee shows severe or pervasive retaliatory harassment by a coworker, the employer is not liable unless it had "actual or constructive knowledge" of the retaliation, and management has "condoned, tolerated, or encouraged the acts of retaliation, or have responded to the plaintiff's complaints so inadequately that the response manifests indifference or unreasonableness under the circumstances." *Laster v. City of Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014).

Here, the district court correctly held that Garcia did not show severe or pervasive retaliation arising out of Luca's telling co-workers that Garcia was lying about the July 2018 incident. R. 86, Opinion, PageID.1538. It further correctly held that Beaumont's response to the

"retaliation" was not so inadequate that it manifested indifference; after all, Beaumont promptly investigated and then punished Luca for merely defending herself. *Id.* at PageID.1539-1540.

Before discussing Garcia's erroneous arguments to the contrary, Beaumont must address the EEOC's amicus brief, which argues that the district court erred because the EEOC's 2016 non-binding interpretive guidelines state that retaliatory harassment does not have to be "severe or pervasive." Amicus Br. 14-15. The EEOC, however, disregards the published 2021 *Wyatt* decision that applies the same "severe or pervasive" standard to sexual and retaliatory harassment. 999 F.3d at 426; *accord Laster*, 746 F.3d at 732 n. 5 (likewise recognizing that retaliatory harassment must be "severe or pervasive.")

In any event, the EEOC's retaliatory harassment argument is not properly before the Court. Garcia herself does not argue that the district court's use of a "severe or pervasive" standard was incorrect and made a material difference in the outcome. Instead, she argues that the district court erred in not finding the "severe or pervasive" standard satisfied under the record. App. Br. 36-37. As a result, the EEOC may not raise a contrary argument on Garcia's behalf. *Self-Ins. Inst. of Am., supra*, 827

F.3d at 560. In any event, the EEOC does not argue that Garcia's allegations satisfy its preferred standard for retaliatory harassment, but instead it criticizes the Court's word choices.[8] *See* Amicus Br. 13-18. The EEOC's academic musings do not undermine the district court here.

### A. Luca's defending herself against Garcia's accusations that Garcia herself spread to co-workers is not retaliation, let alone severe retaliation.

At the outset, this Court should reject the notion that Luca's defending herself against Garcia's accusations is "retaliation" at all under the circumstances—or, at least, that it is not the sort of "severe or pervasive" retaliation that would alter the terms of her employment (or even "sufficiently severe," using the EEOC's phrasing.). Garcia admits that she herself publicized her accusations to co-workers in the department before Luca started responding. *Supra* at 12 n.2. The notion that an employee can make public accusations without the accused

[8]The EEOC recognizes that the district court *did* cite the language it claims is controlling. Amicus Br. 16. This makes even more conspicuous its failure to explain what, if any, material difference there is between the terms "severe or pervasive" and "sufficiently severe." As the Third Circuit noted, there is likely little, if any, difference between the two. *Komis v. Sec'y of United States Dep't of Lab.*, 918 F.3d 289, 299 & n.7 (3d Cir. 2019). As the Third Circuit further noted, several circuit courts likewise continue to use the "severe or pervasive" test as delineating what conduct is sufficient to sustain a retaliation claim. *Id.*

responding is unreasonable and inconsistent with fundamental notions of fair play. *See Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 84 (1st Cir. 2007) (holding, in Title VII retaliation case, that the "person or entity accused of discrimination must be allowed to defend himself or itself."); *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 684 (4th Cir. 2018) (rejecting argument that "false" denials of liability supported retaliation claim as one is "entitled to defend against accusations of discrimination.")

Indeed, this Court and others have recognized that workplace unpleasantries borne from disbelief of a complainant's accusations is not severe or pervasive enough to sustain a retaliation claim. *See, e.g.*, *Akers v. Alvey*, 338 F.3d 491, 498 (6th Cir. 2003) (allegation that former supervisor "encouraged [the plaintiff's] coworkers to ostracize her, which resulted in her 'social death' within the office" insufficient to show retaliatory harassment.); *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 815 (6th Cir. 2004) (en banc) (Clay, J., concurring) ("It is logical that" a workplace complainant "would reasonably expect some backlash, in the form of a limited number of negative consequences, some unhappy colleagues and perhaps even some ostracism," and suggesting that this would likely not deter a reasonable person from complaining); *Noviello*,

*supra*, 398 F.3d at 93 ("Actions that are hurtful to a complainant only because coworkers do not take her side in a work-related dispute may not be considered as contributing to a retaliatory hostile work environment."); *Von Gunten v. Maryland*, 243 F.3d 858, 870 (4th Cir. 2001) ("office unpleasantries that were at most the result of 'predictable tension' in the workplace following the lodging of discrimination and retaliation charges" are not actionable); *see also* R. 86, Opinion, PageID.1538-1539 (citing similar district court opinions).

Here, the alleged "retaliation" Garcia complains of was merely Luca's telling of her side of the story. App. Br. 37-38. A reasonable complainant would have expected Luca to defend herself, particularly when that complainant herself injected those accusations into the workplace conversation by telling co-workers. While Garcia characterizes Luca's self-defense as "slander" and "calling her a liar," that is a distinction without a difference. Given that Garcia and Luca's stories are irreconcilable, both were necessarily telling co-workers the other was a liar—something Garcia recorded herself doing. *See supra* at 13 (telling co-worker Matthewson, in recording, "She's saying I'm a liar. No, she is a liar."). Nowhere does she argue that Luca threatened her, tried to

intimidate her, or the like. Garcia further admits most of her co-workers believed her, and that Luca's denials did not affect Garcia's ability to perform her job duties. R. 72-2, Pl's Dep. 234-235, 285-87, PageID.958, 971. Luca's telling coworkers that she did not assault Garcia and that Garcia's accusations were false is not severe or pervasive retaliation.[9] Because Luca's conduct was not retaliation, the district court correctly granted summary judgment on Garcia's retaliation claim.

**B. For the same reasons, the district court correctly dismissed the individual claim against Luca for retaliation.**

Because it held that Luca's self-defense was not severe or pervasive retaliatory harassment, the district court dismissed Garcia's claim of retaliation against Luca individually. R. 101, PageID.1667-1668. Garcia now argues that Luca's earlier default means that she was entitled to a default judgment regardless of the court's merits ruling. She is wrong—and because Garcia (despite what she now suggests) has sought to use Luca's default as establishing factual "admissions" *against Beaumont*, *see*

[9]Rather than address these points, Garcia quibbles with the court's statement that Luca told only three co-workers. App. Br. 37. This is beside the point; whether Luca defended herself to three people or five, it is not retaliation. But the record shows that Luca allegedly told only Matthewson, Stout, and Serratos. R. 72-2, Pl's Dep. 222, 240 & Ex. 15, PageID.955-59, 1048-49; R. 72-6, Aphram Dep. Ex. 11, PageID.1246.

R. 13, Joint Status Report, PageID.48, Beaumont has a personal stake in opposing Garcia's claim and in avoiding inconsistent judgments.

The Supreme Court has held that if a non-defaulting co-defendant succeeds on the merits of a claim, it would be "unseemly and absurd, as well as unauthorized by law" to issue a default judgment against a defaulting party for the same acts. *Frow v. De La Vega*, 82 U.S. 552, 554 (1872); *accord, e.g.*, *Kimberly v. Coastline Coal Corp.*, 857 F.2d 1474 (6th Cir. 1988) (table) ("If joint, then *Frow*, ancient though it be, still provides the proper mode of procedure."). Here, Beaumont prevailed on the merits of Garcia's retaliation claim—a claim that she pled against both parties jointly, based on the same "retaliatory" acts. R. 28, Am. Compl. ¶¶ 47-50, PageID.156. Under *Frow*, Garcia is not entitled to default judgment.

Although Garcia disputes *Frow*'s viability (ignoring this Court's decision in *Kimberly*), it does not matter. At best, Luca's default means that, *as to Luca alone*, the factual allegations pertaining to the retaliation claim are considered admitted. Wright, Miller, *et al.*, *Federal Practice & Procedure* § 2688.1 (4th ed.). But because a "party in default does not admit conclusions of law," default judgment is inappropriate if the facts alleged do not legally support relief. *Id.* Garcia's allegations are that Luca

called her a liar and denied Garcia's assault allegations. R. 28, Am. Compl. ¶¶ 13-17, PageID.152-153. Thus, Garcia's allegations as pled—even accepted as true—do not warrant default judgment against Luca.

### C. Beaumont's investigation and discipline of Luca shows that it did not condone the alleged retaliation.

Although Luca's conduct was not legally retaliation, Beaumont nonetheless instructed Garcia and Luca to refrain from discussing the incident further after the investigation. When Garcia complained that Luca had violated the directive (despite violating it herself), Beaumont promptly began its investigation. Human Resources obtained witness statements and issued written discipline to Luca. *Supra* at 14-15.

Given these undisputed facts, the district court correctly held no reasonable juror could find that Beaumont's response was so inadequate "that the response manifests indifference or unreasonableness under the circumstances." R. 86, Opinion, PageID.1539-1540 (quoting *Laster*, 746 F.3d at 732). Garcia's argument on appeal is that the time from the investigation's start (August 27, 2018) to the issuance of discipline (October 18, 2018) was too long. App. Br. 39. She cites nothing for the proposition that the investigation's length is relevant, let alone that an

approximate seven-week period from complaint to discipline is too long under the circumstances here. And it is not.

As discussed, this Court held in *Doe* that the "most significant immediate measure an employer can take" in response to a complaint is to "*launch* a prompt investigation." *Doe*, 3 F.4th at 301 (emphasis added). In *Doe*, the investigation was thus reasonable when it started promptly, even though it took more than two months—from December 19 to "the end of February"—until it ended with an inconclusive result. *Id.* at 298, 301-02. Other Courts have expressly rejected similar arguments that investigations took "too long" and thus were inadequate. *See Scarberry v. Exxonmobil Oil Corp.*, 328 F.3d 1255, 1257 (10th Cir. 2003) (three-month period between investigation's commencement and discipline of perpetrator did not render investigation inadequate); *Swenson*, *supra*, 271 F.3d at 1194 (three-to-four-month investigation adequate, noting that complaining party was absent for much of the investigatory period and there were difficulties involved in interviewing her.)

Here, the sequence of events shows a prompt investigation with most of the investigation's length caused by Garcia's own actions. Garcia first made a verbal complaint to supervisor Carroll. *Supra* at 12. Carroll

reported the complaint to HR the same day, and the investigation immediately began with several attempts to contact Luca, who was not at work. R. 72-6, Aphram Dep. 55 & Ex. 6, PageID.1218, 1239. When Luca was next working during business hours, on September 7, she was interviewed. *Supra* at 13. But when Beaumont sought to interview the complainant Garcia, she first informed Beaumont that an interview would have to wait until she returned from vacation. *Supra* at 13-14. Then she took FMLA leave rather than returning from vacation, and when she finally returned in October 2018 she refused to discuss her complaint without her lawyer present, contrary to Beaumont policy. *Id.*

Even so, during that time Beaumont interviewed several witnesses and obtained witness statements. Beaumont concluded its investigation October 9, 2018 and drafted discipline; it was issued to Luca the next day she worked, on October 18. *Supra* at 15. No further "retaliation" occurred afterward. *Id.* Garcia can hardly be heard to complain about alleged delay in a successful investigation ending in discipline when she was responsible for much of the delay. And Beaumont's decision to continue its investigation despite Garcia's roadblocks, following through with discipline, hardly reflects indifference or toleration of Luca's conduct. The

district court's grant of summary judgment on the retaliation issue should be affirmed for this reason too.

## IV. The district court did not abuse its discretion in affirming the taxation of costs against Garcia.

Finally, Garcia dedicates several pages of her appellate brief to a quixotic attempt to avoid a few hundred dollars of taxed costs. App Br. 43-46. But the district court's taxation of costs adhered to its local rules and procedures, and was far from an abuse of discretion.

*First*, Garcia argues that the district court erroneously affirmed the taxation of the transcript cost for her second day of deposition, which she concedes Beaumont cited in its summary-judgment reply brief. App. Br. 43-45. But the Eastern District of Michigan's Bill of Costs Handbook II.C specifically permits taxation of costs of "deposition transcripts used in support of a motion," which the district court held includes reply briefs. R. 103, Order, PageID.1675-1676; *see also* www.mied.uscourts.gov/PDFFIles/BillofCostsHandbook.pdf. Given that the purpose of a reply brief is to support a filed motion, the district court's ruling was correct under the handbook's plain language. But even if the handbook were ambiguous on this point, district courts have "broad discretion" in interpreting their own local rules. *Pearce v. Chrysler Grp., L.L.C. Pension*

*Plan*, 615 F. App'x 342, 349 (6th Cir. 2015). The district court did not abuse its discretion in affirming the taxation of the deposition transcript.

*Second*, Garcia—citing a Michigan statute providing for a $1.75-per-page fee for circuit court hearing transcripts, *see* MCL 600.2543(1)—argues that the cost of Beaumont's deposition transcripts are "clearly unreasonable" because it exceeds that state-court limit. App. Br. 45. But as the district court held, state law does not apply to federal court, and the transcript costs are consistent with other federal cases. R. 103, Order, PageID.1676. Indeed, the federal rates for Eastern District transcripts range between $3.65 and $7.25 per page depending on turn-around time. EDMI Admin. Order 21-AO-034. The district court did not abuse its discretion in affirming the taxation of what, under Garcia's math, would be $3.78 per page, near the low end of the federal scale.

*Third*, Garcia complains about a $40 "Litigation Support Package" cost and a $45.19 "delivery/handle/process" fee. The district court found, in its discretion, that both were permitted by the Bill of Costs Handbook in the categories claimed. R. 103, Order, PageID.1676. Garcia's nickel-and-dime argument over a $85 cost element fails to cite the proper standard, let alone argue how the court abused its discretion.

## Conclusion

The district court's judgments and costs order should be affirmed.

Respectfully submitted,

*/s/Thomas J. Davis*
Eric J. Pelton (P40635)
Thomas J. Davis (P78626)
KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.
280 N. Old Woodward Avenue
Suite 400
Birmingham, Michigan 48009
(248) 645-0000
epelton@khvpf.com
tdavis@khvpf.com
*Attorneys for Defendant-Appellee*
*Beaumont Health Royal Oak Hospital*

Dated: July 1, 2022

## Certificate of Compliance with Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

I hereby certify in accordance with Fed. R. Civ. P. 32(g) and 6th Cir. Rule 32, that this Brief complies with the word limit stated in Fed. R. Civ. P. 32(a)(7)(B)(i). An automated word count of the Brief indicates that it contains 12,932 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 6th Cir. R. 32(b)(1).

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in 14-point Century Schoolbook, which is a proportionally spaced typeface with serifs.

Respectfully submitted,

*/s/Thomas J. Davis*
Thomas J. Davis (P78626)
KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.
280 N. Old Woodward Avenue
Suite 400
Birmingham, Michigan 48009
(248) 645-0000
tdavis@khvpf.com

*Attorney for Defendant-Appellee*
*Beaumont Health Royal Oak Hospital*

Dated: July 1, 2022

**Certificate of Service**

I hereby certify that on July 1, 2022, this Brief for Defendant-Appellee Beaumont Health Royal Oak Hospital was served electronically via the Court's CM/ECF electronic filing system upon all counsel of record.

/s/*Thomas J. Davis*
Thomas J. Davis (P78626)
KIENBAUM HARDY VIVIANO
PELTON & FORREST, P.L.C.
280 North Old Woodward, Ste. 400
Birmingham, Michigan 48009
(248) 645-0000
tdavis@khvpf.com

## Designation of Relevant District Court Documents

Defendant-Appellee Beaumont Health Royal Oak Hospital, pursuant to 6th Cir. R. 28(b), hereby designates the following documents in the District Court's record as relevant to the appeal:

| **Description of Entry** | **Docket Entry Number** | **Page ID Range** |
|---|---|---|
| Complaint | 1 | 1-7 |
| Joint Status Report | 13 | 47-55 |
| First Amended Complaint | 28 | 150-159 |
| Defendant's Motion for Summary Judgment | 72 | 861-897 |
| Ex. A – Plaintiff's Deposition | 72-2 | 899-1085 |
| Ex. B – Carroll Declaration | 72-3 | 1086-1092 |
| Ex. C – Dixon Declaration | 72-4 | 1093-1142 |
| Ex. D – Carroll Deposition | 72-5 | 1143-1203 |
| Ex. E – Aphram Deposition | 72-6 | 1204-1259 |
| Ex. F – Aphram Declaration | 72-7 | 1260-1266 |
| Plaintiff's Response to Motion for Summary Judgment | 73 | 1267-1296 |
| Ex. 2 – Garcia Affidavit | 73-1 | 1303-1306 |

| Description of Entry | Docket Entry Number | Page ID Range |
|---|---|---|
| Defendant's Reply to Response to Motion for Summary Judgment | 74 | 1350-1358 |
| Opinion and Order Granting Motion for Summary Judgment | 86 | 1513-1550 |
| Bill of Costs | 90 | 1570-1579 |
| Taxed Bill of Costs | 91 | 1580-1581 |
| Plaintiff's Motion to Review Action of the Taxation Clerk and Brief in Support | 96 | 1607-1620 |
| Defendant Beaumont Health's Response to Plaintiff's Motion to Review Action of the Taxation Clerk and Taxed Costs | 99 | 1650-1654 |
| Opinion and Order (I) Denying Plaintiff's Revised Motion for Default Judgment Against Defendant Luca; (II) Denying Plaintiff's Motion to Strike Beaumont Health's Response to The Motion; and (III) Sua Sponte Dismissing with Prejudice Plaintiff's Claim Against Defendant Luca | 101 | 1666-1670 |
| Judgment | 102 | 1671 |
| Opinion and Order Denying Plaintiff's Motion to Review Action Of the Taxation Clerk and Affirming Taxed Bill Of Costs | 103 | 1672-1677 |
| Notice of Appeal | 104 | 1678-1679 |